587 So.2d 31 (1991)
STATE of Louisiana, Appellee,
v.
Jimmie HUGHES, a/k/a Jimmi C. Hughes, a/k/a Jimmie C. Hughes Lexing, Appellant.
No. 22463-KA.
Court of Appeal of Louisiana, Second Circuit.
August 21, 1991.
Writ Denied January 10, 1992.
*34 Raymond Cannon, Tallulah, for appellant.
Linda Fowler, and Kathleen Petersen, Asst. Attys. Gen., Baton Rouge, for appellee.
Before NORRIS, LINDSAY and HIGHTOWER, JJ.
NORRIS, Judge.
The defendant and his wife, Jimmie and Elene Hughes, were jointly charged by bill of information with possession of marijuana with the intent to distribute, La.R.S. 40:966 A(1). They were tried before a 12-member jury. Jimmie Hughes was found guilty of attempted possession of marijuana with the intent to distribute; Elene was found guilty of simple possession. Elene drew a suspended sentence which is not contested in this appeal. The trial court sentenced Jimmie Hughes to 12 years at hard labor and a $2,500 fine plus costs (or one year at hard labor in default). Hughes appealed and later obtained an extension of return date or perhaps an out of time appeal. He perfected the instant appeal, advancing several arguments through his retained trial counsel; later, this court granted his motion to change counsel, and newly appointed appeal counsel advanced several arguments; finally, Hughes filed a pro se brief reiterating various arguments and urging ineffective assistance of counsel. For the reasons expressed, we affirm Jimmie Hughes's conviction but amend the sentence to reflect credit for time served and to strike the imposition of default time upon the indigent defendant.

Facts
The instant drug "bust" was the result of an investigation conducted jointly by the Louisiana State Police and the Madison Parish Sheriff Office. Trooper French, who supervised the investigation, testified that he had received numerous complaints about drug sales at the Hughes house on Pecan Street and at their former house (now burned down) on Railroad Street, both in Tallulah. Sergeant Cannon mentioned that officers were using a reliable confidential informant (at the preliminary examination it transpired that this RCI had actually made a "reliability buy" from Jimmie Hughes at the Railroad Street location about a week before the arrest). On the basis of the complaints and the official surveillance, Trooper French obtained search warrants for both locations. Before executing these on July 29, 1988, he continued his surveillance.
*35 Troopers French and Fragala saw Jimmie Hughes come out of the Pecan Street house, get in the 1985 Olds Cutlass parked behind the house and start driving toward Railroad Street. At the first intersection, however, Hughes stopped and signaled to a man in a green pickup truck by holding up a white, folded-up envelope and waving it at him; Hughes then drove on to Railroad Street.
At 3:30 that afternoon separate groups of officers moved on the two locations to execute the warrants. Trooper French and Deputy Baker entered the back door of the Pecan Street house and found Jimmie Hughes walking out of the bedroom immediately to their right. They Mirandized him, secured the house and then searched. Lying on the flat bed in the bedroom from which Jimmie had just emerged was a ziplock bag containing suspected marijuana; the officers seized this and arrested him. Also in the bedroom they found several paper bags containing what appeared to be marijuana or its residue; scissors, packs of cigarette paper, white envelopes and postal scales; a 10-channel scanner tuned to Tallulah City Police frequency and a digital paging system; and an ice chest containing 12 sealed, rolled-up envelopes of suspected marijuana similar to the one Hughes had flashed at the other motorist earlier in the day. In another bedroom officers found a loaded .22 pistol; in the living room a partially-smoked marijuana cigarette; and in the kitchen an ice chest containing three white, rolled-up envelopes of suspected marijuana. The total weight of the suspected marijuana seized was 3/4 lb. The officers found no drugs on Jimmie Hughes's person but seized over $1,300 cash from his wallet and pockets. Elene Hughes, whom Dep. Baker had found in the kitchen, was also arrested. She had no drugs on her person and was carrying only $14 cash. Apparently during the search officers seized the 1985 Cutlass; it was registered in Elene Hughes's name.
Meanwhile, Sgts. Cannon and Fragala had gone to the Railroad Street lot. They were assisted by Dep. Welch and Mr. Cox of the Madison Parish D.A.'s office. By the remains of the house they saw a domino table occupied by several men. One of these, Stanley Gaines, fled the scene carrying a brown paper sack; Sgt. Cannon eventually ran him down. The sack contained 13 white, rolled-up envelopes of suspected marijuana. He was returned to the lot, where the four other suspects were already in custody. At the scene the officers recovered two suspected marijuana "joints" and loose marijuana, rolling paper and a handgun. The officers carried the suspects to the Madison Parish jail and then Sgts. Cannon and Fragala went to Pecan Street to assist Trooper French.
Sgt. Fragala testified that when he reached the house he found Jimmie Hughes sitting handcuffed on the back porch. With his understanding that Hughes had already been Mirandized, Sgt. Fragala struck up a conversation. Hughes said he was "more or less providing a public service by employing these individuals that were selling drugs at the Railroad Street address because * * * the economy was depressed." Hughes felt he was giving them a job or "something to keep them out of trouble."
Sgt. Cannon testified that all suspects were taken to the Madison Parish jail and booked in the small courtroom upstairs. He spoke to Hughes there; Hughes told him the reason he was selling marijuana was that he could not find other work. He got the younger men on Railroad Street involved so they would have something to do.

Procedural background
The searches and arrests occurred on July 29, 1988 (not 1987 as Hughes has stated in brief). Two weeks later, on August 10, the Sixth Judicial District Attorney, James David Caldwell, moved to recuse himself from the prosecution, citing the need to avoid "any inference of prejudice in that he has served as legal counsel for [Jimmie Hughes] on royalty interests of record, song-writing, and publishing rights in the music industry, and has produced a record for the accused with song-writing royalties." After a hearing on August 18 the trial court granted the motion and appointed *36 the Attorney General's office to prosecute the case. Both at this hearing and the preliminary examination the court noted that there were several codefendants and advised Hughes of the risk of conflict of interest in having four defendants represented by the same retained counsel, Mr. Samuel Thomas. Mr. Thomas stated that he perceived no conflict and Jimmie Hughes said he understood the situation.
On October 28, 1988 Hughes filed a motion to quash the indictment on grounds that "the District Attorney filed a Motion to Recuse himself after his office had participated in the investigation and arrest." At a hearing on the motion in January 1989, Hughes argued in effect that the D.A.'s involvement in the investigation and arrest of a suspect whom he knew invalidated the charge. The trial court denied the motion, noting that just because the D.A. knew the defendant was no reason to deny the state its chance to investigate.
Later in January 1989, the trial court held a hearing on Jimmie Hughes's motion to release the 1985 Cutlass. The state conceded that the hearing for civil forfeiture was not scheduled until after trial, but argued that the car was mentioned in the search warrant and seized incident to an arrest. The trial court denied the motion.
At trial in March 1989, law enforcement officers testified to the facts of the searches and arrests as outlined above. A forensic scientist verified that the green vegetable matter seized from the house and lot were marijuana; an expert in latent fingerprints testified that Jimmie Hughes's palm print was found on the owner's manual of the radio scanner, but no other match was found in the various latents taken at the house.
Also testifying for the state was Stanley Gaines, the man who had attempted to flee from the lot when the officers arrived. For his part in the offense Gaines pled guilty to possession of marijuana with the intent to distribute; he testified that he drew three years, suspended, with the condition that he serve one year. Gaines testified that he was picking up packages of marijuana from Hughes in the morning and carrying them to the lot on Railroad Street for sale; he was selling when the arrest occurred. Hughes gave him some walkie talkies to use if he saw the law coming; he also gave Gaines a handgun to "warn off" anyone who might disrupt business. Gaines also testified that Hughes was paying him about $25 a day, plus expenses, for his services; he did not know if Hughes was selling from the house on Pecan Street. Gaines insisted there was no "deal" and he received no special treatment for testifying against Hughes; he was only to tell the truth.
The only defense witness was codefendant Elene Hughes. She testified that her husband is a singer and songwriter who has cut 88 records; he uses a large band whose members sometimes stay in the Pecan Street house; he has recorded for James Caldwell; because of Jimmie's schedule Elene did not see much of him. On the day of the arrest, a man named Main Robinson had come to visit and was standing by Jimmie's open bedroom window; when the officers appeared, Robinson disappeared. Elene denied any knowledge that Jimmie was running a drug operation from the house; in fact, she had never seen drugs there until that day. She testified that after doing a gig, Jimmie would be paid around $1,000, usually in cash, which would explain why he might be carrying a lot of cash on any given day. On cross examination the Assistant Attorney General asked her if Jimmie smoked marijuana; Mr. Thomas objected, urging a spousal privilege. The trial court overruled the objection, and Elene replied that she was not certain whether Jimmie smoked pot, but she had not seen a lot of him lately. She added that she was taking a correspondence course, which accounted for the postal scales and numerous envelopes in the house.
The jury found Jimmie Hughes guilty, by 10-2 vote, of attempted possession of marijuana with the intent to distribute. Because of a discrepancy, however, the court had to poll the jury twice; the defendant did not object to the polling procedure. The verdict was entered and on May 22, *37 1989, the court sentenced Jimmie Hughes to 12 years at hard labor and a fine of $2,500 plus costs or, in default of paying the fine, one year at hard labor.

Discussion: Preliminary matters
At the outset we acknowledge that the state has lodged several arguments contesting the validity of the appeal. It contests (1) the court's decision on February 13, 1990 to extend the return date of the original appeal or grant an out of time appeal; (2) the court's decision to allow substitute appellate counsel, Mr. Cannon, to file and brief new assignments of error; and (3) the propriety of Hughes's pro se assignments and brief, both lodged in this court after the matter was submitted. For reasons discussed at greater length in an unpublished appendix, we conclude the trial court did not abuse its discretion in granting an additional extension of the return date on February 13, 1990. The purpose of La.C.Cr.P. art. 915.1 A and State v. Counterman, 475 So.2d 336 (La.1985), is to preserve the defendant's constitutional right of appeal. On this record we find the defendant's failure to meet the return date was due to trial counsel's conduct, for which Hughes should not be penalized. Mr. Thomas ultimately filed and briefed eight assignments of error.
We also find no error in the order permitting new appellate counsel, Mr. Cannon, to file and brief additional assignments of error. This court granted a writ to substitute counsel in light of Hughes's claims that trial counsel had a conflict. To prohibit new counsel from advancing new arguments would make the substitution meaningless. The court did not err in granting Mr. Cannon leave to file his four new assignments and to brief them.
After the case was submitted on June 17, 1991, Hughes filed a pro se "Reply Brief" based on seven "Supplemental Assignments of Error" which were filed in the trial court without leave of court. Except for claims of ineffective assistance of counsel and a request for error patent review, the "Reply Brief" merely restates or embellishes the assignments and arguments advanced by counsel; we see no need to address these repetitive arguments. Ineffective assistance is not manifest on this record and the issue is better reserved for petition for post conviction relief. La. C.Cr.P. art. 930.3; State v. Boatright, 406 So.2d 163 (La.1981); State v. Bonnett, 524 So.2d 932 (La.App. 2d Cir.), writ denied 532 So.2d 148 (1988). We also note that while a defendant has the right to be assisted by counsel or to represent himself, he does not have the right to do both. U.S.C.A. Const. amends. 4, 14; La. Const. art. 1 § 13; Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); State v. Bodley, 394 So.2d 584 (La.1981); State v. Gene, 587 So.2d 18 (La.App. 2d Cir.1991), handed down today, and citations therein. For these reasons we decline to consider the issues as raised in Hughes's pro se "Reply Brief."
Hughes specifically abandoned one assignment of error (No. 4), and four others must be considered without merit for lack of a contemporaneous objection (Nos. 3, 6, 9 and 11). Further discussion of these matters is included in the unpublished appendix.

Wrongful seizure of the automobile
By his second assignment Hughes urges the trial court erred in allowing improper seizure of a vehicle belonging to Elene Hughes when there were no drugs found on Elene Hughes or in her vehicle. Without elaboration, Hughes cites State v. Spooner, 520 So.2d 336 (La.1988), as the applicable law.
Every person shall be secure in his person, property, communications, houses, papers and effects against unreasonable searches, seizures, or invasions of privacy. Any person adversely affected by an unreasonable search or seizure shall have standing to raise its illegality in the appropriate court. La.Const. art. 1 § 5; State v. Gibson, 391 So.2d 421 (La.1980). A defendant may contest the search and seizure of a third person's car, even if the defendant has no proprietary interest in it, if he has an expectation of privacy and is adversely *38 affected by the search. State v. Cody, 446 So.2d 1278 (La.App. 2d Cir.1984). Civil forfeiture procedures subject to seizure any vehicle that is used or intended for use in the transportation, sale, receipt, possession, manufacture, compounding, dispensation or concealment of controlled dangerous substances. La.R.S. 32:1550A(5). Any property subject to seizure may be seized without process if the seizure is incident to an arrest with probable cause or pursuant to a search under a valid warrant. La.R.S. 32:1550B(1).
Hughes presumably had an expectation of privacy in his wife's car. However, no contraband or other evidence that would adversely affect his legal position was seized from the car. Hughes was not prejudiced by the search. Elene Hughes may have been inconvenienced by the loss of her car but it was her right, not her husband's, to seek its return. The car was in fact returned to her by judgment of May 4, 1990. Moreover, the officers were entitled, with their search warrant for the house and their observation that Hughes was using the car to carry suspected marijuana, to seize the car in anticipation of civil forfeiture. See State v. Spooner, supra. This assignment lacks merit.

Recusal of the District Attorney
By his first assignment Hughes urges the trial court "committed error when the district attorney recused his office, after investigation, arrest and filing of bill of information. The district attorney was fully aware of his relationship to the defendant during the totality of the proceedings, thus denying defendant a fair and impartial administration of justice." This was the substance of his motion to quash, which was denied. Hughes further argues, by his fifth assignment, that the trial court erred in admitting the testimony of Stanley Gaines, taken by the D.A.'s office after it recused itself.
At the outset we must correct various misstatements in the defendant's brief. The D.A.'s office did not file the bill of information; this came after the D.A. recused itself. R.p. 42. The court did conduct a contradictory hearing on the motion to recuse, in accord with La.C.Cr.P. art. 681; although the record does not show that Mr. Thomas received written notice of the hearing, he was present. The D.A.'s investigator, Mr. Cox, did indeed participate in the arrests on Railroad Street, but not in Hughes's arrest. How much the D.A.'s office may have participated in the overall investigation is not clear but appears to be minor.
Hughes's first argument, that the trial court erred in granting the recusal, is plainly meritless. Mr. Thomas acquiesced in the order. R.p. 142. Recusal was proper; Mr. Caldwell, with his business association with Hughes, had a "personal interest in the cause." La.C.Cr.P. art. 680(1).
Hughes's main argument is that the D.A. simply could not investigate any part of this case, as recusal was bound to be necessary for trial. The D.A. has charge of every criminal prosecution by the state in his district, and is the state's representative and advisor to the grand jury. La. Const. art. 5 § 26(B). The D.A.'s power over criminal investigations is not as clearly defined.
In Plaquemines Parish Comm'n Council v. Perez, 379 So.2d 1373 (La.1980), the plaintiff, Chalin Perez, president of the parish commission, sued to enjoin the D.A., Leander Perez, from taking any action with respect to an investigation of allegations of theft of public funds by the parish commission. Chalin Perez had not yet been arrested, but Leander Perez convened a special grand jury for the case; Chalin alleged the D.A. was his brother and enemy. The Supreme Court analyzed the applicable statute, La.C.Cr.P. art. 680, which at the time provided (excluding clauses in brackets):
Art. 680. Grounds for recusation of district attorney
A district attorney shall be recused when he:
(1) Has a personal interest in the cause [or grand jury proceeding] which is in conflict with fair and impartial administration of justice;

*39 (2) Is related to the party accused or to the party injured, or to the spouse of the party accused or party injured, [or to a party who is the focus of a grand jury investigation,] to such an extent that it may appreciably influence him in the performance of the duties of his office; or
(3) Has been employed or consulted in the case as attorney for the defendant before his election or appointment as district attorney.
The court observed the the words "case" and "cause" in this article were intentionally ambiguous; the legislature did not set a fixed point in the criminal process where all recusals must take place. Each case must be decided on its own merits. The court contrasted a situation where the D.A. might be investigating his brother for murder or theft, from one in which he might investigate an enemy for criminal activity. In the former a certain, completed act has occurred; recusal would be mandatory for the state. In the latter, the offense is uncertain and recusal not mandatory. The court reasoned that different values affect society's interest in prosecution and investigation; intense investigative activity may serve society's interest while intense prosecutorial effort may not. A fair and impartial trial is constitutionally guaranteed, but not a fair and impartial investigation. A defendant may seek to suppress evidence illegally obtained but may not dismiss the entire investigation. The court held that Chalin Perez was not entitled to enjoin his brother the D.A. from convening a grand jury to look into the charges of theft.
In response to Perez, the legislature amended art. 680 by La.Acts 1980, No. 195. It added the passages in brackets above, the references to grand jury proceedings. In the instant case there was no grand jury proceeding and the propriety of the D.A.'s actions must stand on the merits.
Mr. Thomas tried to get Trooper French to admit that the D.A. might have been supplying Hughes with drugs and money for a "sting" operation, but French denied it. R.p. 650. Dep. Baker also rejected this theory. R.p. 753. There is no evidence that Mr. Caldwell started or was personally involved in investigating Hughes, or even knew that Hughes was a suspect. Several witnesses testified that Mr. Cox took part in the "bust" on Railroad Street, but there was no evidence that he was greatly involved in the case until shortly before the arrest. The investigation was conducted by the State Police and the Sheriff Office; Mr. Cox's (and, vicariously, the D.A.'s) part seems to have been minimal. If the D.A.'s role was greater, Mr. Cox or Mr. Caldwell could have been called as witnesses; they were not. Finally, there is no indication that the D.A.'s office illegally based its investigation on privileged information, even though the trial court said it would entertain a motion to suppress evidence so obtained. R.p. 222. Under these facts, we find no error in the trial court's recusal order.
Hughes's fifth assignment argues that once Mr. Caldwell was recused, he was unable even to negotiate a plea with Stanley Gaines whereby Gaines would testify against Hughes. The defendant cites no authority that a D.A. must further recuse himself from other cases which may generate evidence against the accused, and we are aware of none. True, Gaines plea bargained with an assistant D.A. and talked with Mr. Cox, but the D.A. was not recused from Gaines's case. Under these facts, the D.A.'s level of involvement in Gaines's case did not violate the recusal order in Hughes's case.
These assignments do not present reversible error.

Spousal privilege
By his tenth assignment Hughes urges the trial court erred in not allowing the codefendant, Elene Hughes, to assert her spousal privilege. He argues that while the information sought was not a conversation, requiring her to testify violated the general spousal privilege. La.R.S. 15:461(2). He also argues that the prosecutor's question was an impermissible reference to other crimes evidence in violation of La.C.Cr.P. art. 770(2). There was, however, no trial court objection based on art. *40 770 and it is not preserved for review. La.C.Cr.P. art. 841.
Louisiana law grants two spousal privileges. R.S. 15:461 provides in part:
The competent witness in any criminal proceeding, in court or before a person having authority to receive evidence, shall be a person of proper understanding, but;
(1) Private conversations between husband and wife shall be privileged.
(2) Neither husband nor wife shall be compelled to be a witness on any trial upon an indictment, complaint or other criminal proceeding, against the other.
Spousal privilege is not constitutional in nature. State v. Day, 400 So.2d 622 (La.1981). The "private conversations" privilege has been strictly construed and does not protect other communications such as letters. State v. Fuller, 454 So.2d 119 (La.1984); State v. Strong, 463 So.2d 830 (La.App. 2d Cir.), writ denied 466 So.2d 1300 (1985). It may not be waived except by both spouses. State v. Adams, 394 So.2d 1204 (La.1981); State v. Bennett, 357 So.2d 1136 (La.1978). Because the prosecutor's question did not probe into a private conversation, this privilege did not apply.
The general spousal privilege exempts a spouse from being compelled to be a witness against the other spouse. The testifying spouse may waive this privilege, even over the objection of the defendant spouse. State v. Bennett, supra. Elene Hughes tried to assert this privilege on cross examination. The scope of cross examination is defined in La.C.E. art. 611B, which provides that a witness may be cross examined on any matter relevant to any issue in the case. According to Comment (e), this article does not change the rule of former La.R.S. 15:462 (repealed by La.Acts 1988, No. 515), which provided:
When a person accused, or a husband or wife becomes a witness, such witness shall be subject to all the rules that apply to other witnesses, and may be cross-examined upon the whole case.
The plain meaning of art. 611B is that when a witness takes the stand in his or her spouse's defense, the witness is subject to full cross examination. Admittedly, part of Elene Hughes's purpose in testifying was to defend herself. However, her direct testimony was also aimed at defending her husband; she said she never saw any drugs at the house until that day, that Jimmie Hughes had "absolutely no time" to be involved in a drug ring, and that he kept going to the lot with some "guys" only to help tear down the burned house. R.pp. 815, 818, 817. With these exculpatory statements, Elene Hughes opened herself to further questioning on cross examination about her husband's possible drug activity. The trial court did not err in overruling the objection, and this assignment does not present reversible error.

Conflict of interest
By his twelfth assignment Hughes urges that his trial counsel, Mr. Thomas, had an "actual" conflict of interest in two respects: he intended to run for District Attorney, thus dividing his loyalty; and he represented several of Hughes's codefendants.
When a defendant urges conflict of interest on appeal, the reviewing court must perform a two-step analysis. First, did the defendant assert a conflict of interest during the proceedings or were there "special circumstances" present which should have prompted the trial court to inquire about the potential conflict? State v. Seay, 521 So.2d 1206 (La.App. 2d Cir.1988); State v. Rowe, 416 So.2d 87 (La. 1982), citing Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) and Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). If either of these factors is present, then the trial court must either appoint new counsel or take adequate steps to ascertain whether the risk of conflict is too remote to warrant separate trials; if the trial court failed to take action on the potential conflict, there is a presumption of prejudice. State v. Seay, supra. The fact that the state expresses concern over the potential conflict does not, in itself, give rise to the presumption. State v. Seay, supra. Moreover, *41 multiple representation does not per se constitute a "special circumstance" warranting further inquiry by the trial court. Cuyler v. Sullivan, supra. This is because multiple representation often provides the enhanced strength of a common attack. Cuyler v. Sullivan, supra; Wood v. Georgia, 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981).
If there was no objection or "special circumstance" in the trial court, the reviewing court must ask, was there an actual conflict adversely affecting the attorney's performance? State v. Seay, supra, and citations therein. An actual conflict is established by showing the attorney was placed in a situation inherently conducive to divided loyalties. State v. Seay, supra; Zuck v. Alabama, 588 F.2d 436 (5th Cir.), cert. denied 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979). A conflict affects an attorney's performance when it compromises his choice of defenses and his ability to make free choices. State v. Morrow, 440 So.2d 98 (La.1983). No conflict results from multiple representation when the defenses are compatible and consistent and neither defendant tries to inculpate the other. State v. Kahey, 436 So.2d 475 (La. 1983). The reviewing court will therefore not presume that joint representation, not asserted until after trial, resulted in actual conflict.
Here the potential for conflict was twice called to the court's attention by the prosecutor. At the August 18, 1988 hearing on the motion to recuse, the court asked Mr. Thomas if he was representing all four defendants charged in the offense; Mr. Thomas replied there was no conflict of interest problem. R.p. 142. On October 5, 1988, Hughes and the other defendants appeared in court for a bond reduction hearing. The court denied Hughes's bond request, after which the Assistant Attorney General asked the court to advise all defendants about the danger of using the same lawyer. The court did so. R.pp. 214-216. At first Hughes appeared confused and determined to contest the bond ruling, but he said he understood the conflict situation. R.p. 218. Under these circumstances, Hughes's assertion in brief that multiple representation posed a problem he "was only made aware of when he filed his motion for contiuance and substitution of appeal counsel" is completely untenable. On two occasions the court advised and questioned Hughes about the situation; both times Hughes assured the court there was no problem; the trial court took adequate steps to assure that Hughes had conflict-free counsel.
Later, Jimmie and Elene Hughes were tried together, but their defenses were consistent and compatible. Elene did not point the finger of blame at Jimmie, even under cross examination. We do not see how Elene's election to testify was a special circumstance to activate the court's duty to inquire into a conflict.
The other alleged conflict, Mr. Thomas's aspiration to run for D.A., was neither pointed out, nor remotely apparent, to the court before or during trial. Given these facts, Hughes has not shown that the presumption of prejudice under Cuyler v. Sullivan, supra, applies.
We must therefore address the second question. Hughes cites several instances where he feels Mr. Thomas's loyalty was divided between clients. For instance, Mr. Thomas intimated that Henry Batchelor was the guilty party because his fingerprints were not submitted for analysis. Hughes seems to feel that had Mr. Thomas more zealously accused Batchelor, Hughes could have been cleared. However, the main thrust of Mr. Thomas's comment was to impeach the adequacy of the investigation, not to blame Batchelor. Hughes also suggests that Mr. Thomas could have got other codefendants to testify in Hughes's behalf, but did not because of his loyalty to them. There is no showing, however, that the codefendants would have testified favorably; the one who did testify, Gaines (whom Mr. Thomas did not represent) gave very incriminating evidence. Finally, Hughes suggests that by bringing out the discrepancy between the amount of cash found on him and his wife, Mr. Thomas absolved Elene but implicitly incriminated Jimmie. We note, however, *42 that Elene offered a credible explanation of why her husband was carrying such a large sum, over $1,300. Furthermore, Mr. Thomas did not belabor the point; on the whole, Elene's testimony was very favorable to her husband, and we do not find that Mr. Thomas's decision to have her testify adversely affected Hughes's defense.
Mr. Thomas's bid for Madison Parish D.A. was not announced until December 1989, or nine months after the instant trial, according to attachments to brief. On this record there is no showing that his political aspirations diminished his efforts in Hughes's behalf; we would actually expect an office-seeker to be more zealous in his client's behalf. After trial Mr. Thomas was unsuccessful in reducing Hughes's bail and did not move for a new trial; but denial of bail was almost inevitable in light of Hughes's sentence, and there is no clue, either in brief or patent on the record, of what grounds for new trial would have been urged. True, Mr. Thomas's handling of the appeal was dilatory and may have been affected by involvement in the D.A. race. However, this court ordered, and the trial court appointed, new counsel who reviewed the case, re-argued several of the original assignments and designated and argued several new ones. The appeal was delayed but not prejudiced. We do not find on this record that Mr. Thomas's political aspirations have adversely affected his defense of Hughes. This assignment does not present reversible error.

Sufficiency of evidence
By his seventh assignment Hughes urges the evidence was insufficient to convict him of attempted possession of marijuana with the intent to distribute. Calling the case circumstantial, he cites various points as creating reasonable doubt: the officers did not stop Hughes when they allegedly saw him with drugs, but arrested him when there was nothing on him; his fingerprints were not found on any of the bags of marijuana, or the gun or walkie talkie; the scanner was not seen by the fingerprint expert; other people lived in the house and they could have possessed the marijuana; merely owning a police scanner is not indicative of crime. Hughes also reasserts his theory that he was actually conducting an undercover operation under the direction of the D.A., Mr. Caldwell, and he attacks the credibility of Stanley Gaines.
The standard of appellate review is whether the record evidence, viewed in light most favorable to the state, is sufficient that any rational finder of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307 (1979); La.C.Cr.P. art. 821. This standard applies to cases involving both direct and circumstantial evidence. Conflicts in direct evidence must be resolved in light most favorable to the state, and the facts established by the direct evidence and inferred from the circumstantial evidence must pass the Jackson v. Virginia test. State v. Sutton, 436 So.2d 471 (La.1983); State v. Lott, 535 So.2d 963 (La.App. 2d Cir.1988).
The crime of attempted possession of marijuana with the intent to distribute is defined by La.R.S. 40:966A(1) and 14:27:
§ 966. Penalty for distribution or possession with intent to distribute narcotic drugs listed in Schedule I; possession of marijuana
A. Manufacture; Distribution. Except as authorized by this part, it shall be unlawful for any person knowingly or intentionally:
(1) To produce, manufacture, distribute or dispense or possess with intent to produce, manufacture, distribute, or dispense, a controlled dangerous substance classified in Schedule I[.]
§ 27. Attempt
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
*43 The state must therefore establish an attempted possession and an intent to distribute marijuana.
Attempted possession may be proved by constructive possession. State v. Matthews, 552 So.2d 590 (La.App. 2d Cir.1989), writ denied 559 So.2d 137 (1990); State v. Dunn, 446 So.2d 829 (La.App. 2d Cir.1984); State v. Jackson, 557 So.2d 1034 (La.App. 4th Cir.1990). Constructive possession may be proved by showing the accused had actual dominion and control of the substance. State v. Tyler, 544 So.2d 495 (La.App. 2d Cir.1989); State v. O'Neal, 501 So.2d 920 (La.App. 2d Cir.), writ denied 505 So.2d 1139 (1987). The court may also consider the defendant's knowledge that illegal drugs were in the area, his access to the area where the drugs were found, evidence of recent drug use by the defendant, his physical proximity to the drugs, and any evidence that the particular area was frequented by drug users. State v. Tyler, supra, citing State v. Love, 527 So.2d 62 (La.App. 3d Cir.1988).
Trooper French and Dep. Baker testified that when they entered his house Hughes was walking out of the bedroom where a plastic bag of marijuana was found in plain view on a bed and quantities of marijuana and paraphernalia for its packaging were found hidden. More marijuana was found elsewhere in the house. The officers testified, and Elene Hughes verified, that Jimmie Hughes occupied the house. Hughes admitted to Sgts. Cannon and Fragala that he was selling drugs because he could not find any other work and was giving the "boys" something to do. Stanley Gaines added that Hughes gave him marijuana each morning to sell and sent him to Railroad Street for that purpose. This evidence is sufficient to prove that Hughes had dominion and control over the marijuana found in the house on Pecan Street and on the person of Stanley Gaines.
The second element is intent to distribute; when this is based on circumstantial evidence, the state must prove that the amount of the substance or the manner in which it was carried is inconsistent with personal use. State v. Greenway, 422 So.2d 1146 (La.1982); State v. Johnson, 513 So.2d 832 (La.App. 2d Cir.1987), writ denied 519 So.2d 124 (1988). The factors useful in making this determination on circumstantial evidence are listed in State v. House, 325 So.2d 222 (La.1975):
(1) Whether the defendant ever distributed or attempted to distribute marijuana;
(2) Whether the marijuana was in a form usually associated with distribution to others;
(3) Whether the amount was such as to create a presumption of intent to distribute;
(4) Expert or other testimony that the amount found in defendant's possession was consistent with personal use only; and
(5) Presence of any paraphernalia, such as baggies or scales, evidencing an intent to distribute.
Though the amount of marijuana actually seized was not large, Hughes had a lot of cash on his person, and envelopes, scissors and scales in his house; all this is highly probative of intent to distribute. The pager, police scanner and manual indicate a design to protect the enterprise from police scrutiny. Stanley Gaines's testimony is direct evidence of intent: he sold marijuana as an agent of Hughes's. Moreover, Gaines is corroborated by the evidence found at the lot on Railroad Street (the rolled marijuana cigarettes, the cigarette papers, white envelopes) and on his person (envelopes of marijuana rolled and packed just like the ones found in Hughes's house). Hughes's admission to the officers also proves intent to distribute.
Hughes's contentions that the marijuana could have belonged to someone else who was staying in the house, or that Main Robinson could have tossed the bag through an open window onto Hughes's bed moments before the arrest, or that other potential suspects were not pursued, do not rise to the level of reasonable doubt on this record. The contention that Hughes was running an undercover drug operation at the D.A.'s behest is purely conjectural; every officer denied any *44 knowledge of such an arrangement and Hughes's business ties with Mr. Caldwell logically explained their numerous visits. Finally, Stanley Gaines was indeed subject to attack as a credible witness. Mr. Thomas made great efforts to expose his alleged bias; the state rehabilitated him. A credibility call is within the jury's province. State v. Trosclair, 443 So.2d 1098 (La. 1983). The jury obviously accepted Gaines's testimony and this was not an abuse of discretion. State v. Mussall, 523 So.2d 1305 (La.1988); State v. Holland, 544 So.2d 461 (La.App. 2d Cir.1989), writ denied 567 So.2d 93 (1990). The evidence was sufficient to persuade any rational trier of fact beyond a reasonable doubt that Hughes attempted to possess marijuana with the intent to distribute. This assignment does not present reversible error.

Excessive sentence
By his eighth assignment Hughes urges the trial court erred in imposing an excessive sentence. He further claims the court wrongly refused to let him give the court information that would mitigate the sentence, in violation of due process. He finally contests the imposition of default time in lieu of the fine, citing State v. Cushenberry, 573 So.2d 1199 (La.App. 4th Cir.1991).
The test of excessiveness is two-tiered, the first being a review of the trial court's compliance with the mandatory sentencing guidelines of La.C.Cr.P. art. 894.1. State v. Sepulvado, 367 So.2d 762 (La.1979). Hughes does not specifically argue that the court failed to apply these guidelines; in fact, the record shows adequate consideration of the relevant factors.
The second tier is constitutional excessiveness. A sentence violates La. Const. art. 1 § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless imposition of pain and suffering. State v. Bonanno, 384 So.2d 355 (La.1980). The sentencing judge has wide discretion in imposing a sentence within statutory bounds and such a sentence should not be set aside absent an abuse of discretion. State v. Square, 433 So.2d 104 (La.1983); State v. Hudgins, 519 So.2d 400 (La.App. 2d Cir.), writ denied 521 So.2d 1143 (1988).
A defendant cannot be denied the chance to rebut the information articulated by the court during sentencing or to produce mitigating factors. State v. Ray, 423 So.2d 1116 (La.1982); State v. Cox, 369 So.2d 118 (La.1979). The court does not have the affirmative duty to ask whether the defendant has anything to say. State v. Brown, 440 So.2d 994 (La.App. 3d Cir. 1983), writ denied 444 So.2d 120 (1984). The opportunity to do so is waived if not asserted before sentence is passed. State v. Cox, supra; State v. Buie, 477 So.2d 157 (La.App. 1st Cir.1985). Moreover, error in denying the defendant this opportunity is harmless if there is no proof that the sentencing information was materially and prejudicially false. State v. Berain, 360 So.2d 822 (La.1978); State v. Washington, 414 So.2d 313 (La.1982).
The trial court ordered and reviewed a presentence investigation report and noted that Hughes was a second felony offender and also had a prior conviction for possession of marijuana. Hughes had at that time received only a $300 fine but was warned by the court that future episodes of involvement with illegal drugs would be dealt with harshly. The court stated that not only was Hughes involved in drugs but he was running a sophisticated operation for distribution with radios to detect police in the area. The presence of firearms created a dangerous situation and jeopardized officers' safety. We note that these facts would support a conviction for the charged offense and not just an attempt. Hughes's prior record, including a marijuana offense, the gravity of the instant offense and the depth of his involvement in it all counseled in favor of a heavy sentence.
Convicted of attempted distribution of marijuana with the intent to distribute, Hughes faced from two and one-half to 15 years at hard labor and a fine of up to $7,500. La.R.S. 40:966B(2), 14:27D(3). The sentence of 12 years at hard labor and a fine of $2,500 is in the upper range for attempted possession with intent to distribute *45 marijuana; however, in light of Hughes's record and circumstances that would have supported a conviction for the greater offense, it is not an abuse of the trial court's discretion. It does not shock our sense of justice.
Hughes did not attempt to traverse the sentencing information until after sentence was passed. He therefore waived it. Moreover, he has not set forth in brief what mitigating factors applied, or what information he had to "show" the judge, or whether anything in the PSI was even wrong. Under these circumstances we perceive no prejudice from the trial court's refusal to let Hughes speak out of turn. These aspects of the case do not present reversible error.
Hughes's claim as to default time, however, requires us to amend the sentence. In State v. Monson, 576 So.2d 517 (La.1991), the Supreme Court granted a writ with an order for the trial court to find whether the defendant, who had received default time, was indigent. The Supreme Court indicated that indigency may be determined prior to the time the defendant is called upon to make restitution or pay the fine, contrary to this court's earlier holding in State v. Taylor, 512 So.2d 663 (La.App. 2d Cir.1987). See Bearden v. Georgia, 461 U.S. 660, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983). In light of the implications of State v. Monson, supra, we decline to continue the rationale of State v. Taylor and hold that a defendant who has been found indigent cannot be subjected to default time in lieu of the payment of a fine, costs or restitution. Hughes was declared indigent by the trial court on February 13, 1990, nearly nine months after sentence was imposed. The sentence will be amended to strike the default time.

Error patent
We have reviewed the record for error patent. La.C.Cr.P. art. 920(2); State v. Oliveaux, 312 So.2d 337 (La.1975). The court, when it imposes sentence, shall give the defendant credit toward service of his sentence for time spent in actual custody prior to the imposition of sentence. La. C.Cr.P. art. 880. Failure to do so is error patent. State v. Allen, 571 So.2d 758 (La. App. 2d Cir.1990); State v. Agee, 534 So.2d 483 (La.App. 5th Cir.1988), writ denied 540 So.2d 326 (1989). On the basis of the numerous motions to reduce bond and the writ applications in this record it is apparent that Hughes spent 297 days in actual custody from the date of his arrest to the date of sentencing. The sentence and court minutes will be amended to reflect this credit.
Further review discloses nothing else we consider to be error patent.

Conclusion
For the reasons expressed, the conviction is affirmed. The sentence is amended to reflect credit for 297 days served prior to sentencing, and to strike the imposition of default time in lieu of payment of the fine. The sentence is otherwise affirmed.
CONVICTION AFFIRMED; SENTENCE AMENDED AND AFFIRMED.
HIGHTOWER, J., dissents in part with reasons.
HIGHTOWER, Judge, dissenting in part.
Although agreeing in all other respects, I would not at this time delete the default time.
This case, as do many others, illustrates the logic of this court's position in State v. Taylor, supra, a position which the Supreme Court has not addressed save by writ orders. See also State v. Lewis, 506 So.2d 562 (La.App. 2d Cir.1987).
Defendant Hughes has apparently been actively engaged in the music industry for several years. According to the appellate record, he is a singer and songwriter and originated some 88 recordings. The motion for recusal by the district attorney, who previously counseled defendant in such artistic pursuits, refers to Hughes' royalty interests from records, songwriting and publishing rights. Indeed, the motion specifically mentions movant's production of a record with reservation of songwriting royalties for the accused.
*46 Possibly then, several years from now when Hughes faced service of his default time, he could well be financially capable of satisfying his fine. Yet, following what we term the "implications" of Monson, supra, results in deleting the default time, here and now.
Plainly stated, this should not be the law.