768 So.2d 748 (2000)
STATE of Louisiana, Appellee,
v.
Dennis D. GEORGE, Appellant.
No. 33,859-KA.
Court of Appeal of Louisiana, Second Circuit.
September 27, 2000.
*751 Paul Henry Kidd, Monroe, Counsel for Appellant.
Richard Ieyoub, Attorney General, Robert Levy, District Attorney, A. Shawn Alford, Assistant District Attorney, Counsel for Appellee.
Before WILLIAMS, GASKINS and KOSTELKA, JJ.
GASKINS, J.
The defendant, Dennis George, was indicted for second degree murder, a violation of La. R.S. 14:30.1. After a jury trial, he was convicted of the responsive verdict of manslaughter, a violation of La. R.S. 14:31, and the trial court imposed a sentence of 25 years at hard labor. The defendant appealed his conviction and sentence. For the following reasons, we affirm.

FACTS
The defendant and the victim, Dewander[1] Bennett, had a sexual relationship which resulted in the birth of a son in April 1997. Prior to the child's birth, the defendant had terminated his relationship with the victim and subsequently become involved with another woman. After the end of their relationship, the victim harassed the defendant by repeatedly telephoning and visiting his home. On one occasion, she reportedly slashed the tires on his truck. The defendant's mother apparently obtained a restraining order prohibiting the victim from coming to her house. According to the defendant, the victim's harassment caused him to move from Bernice, Louisiana, to El Dorado, Arkansas.
On May 9, 1997, the defendant and his new girl friend visited his mother at her home in Bernice. While they were sitting in the front yard, the victim came by and asked the defendant if he wanted to see photos of their 32-day old baby. He responded negatively, indicating that he would wait until his questions concerning the child's paternity were resolved. The victim asked his mother if she wanted to see the photos; she also responded negatively. Thereafter, the victim made several vulgar statements in the presence of the defendant and the two women. The defendant and his mother went into the house. The defendant got a shotgun and began to go outside. His mother told him to put the weapon down, and he complied.
The victim and the defendant's girl friend exchanged unpleasantries outside. Testimony indicated that the girl friend had a knife in her hand; the victim reached into her purse, but she did not produce a weapon. At about this time, a friend of the victim came upon the scene and insisted that the victim leave with her. In the meantime, the defendant's mother had telephoned the police. A police officer responded to the call and ordered the victim to leave the premises. She did so.
The defendant and his girl friend returned to El Dorado on his motorcycle. He then came back to Bernice alone in his truck; he had a .38 revolver under the front seat of his vehicle. He saw the victim with some friends in the driveway of a house not far from his mother's residence. Upon seeing her, he stopped and backed up his truck. The victim and two other women were in the process of getting into a car which was parked in the driveway. Approximately two hours had passed since the confrontation at the home of the defendant's mother.
After blocking the driveway with his truck, the defendant exited the vehicle with the gun concealed under his shirt. Witnesses testified that the defendant appeared very angry and had a "strange" look on his face. Seeing him, the victim told him not to start anything. He responded, "Bitch, you have f_____ with me for the last time," and pulled the gun. The victim and the other persons in the driveway began to run. The defendant *752 then shot the victim in the head as she tried to flee. As she lay on the ground, he advanced upon her, saying "I told you I was going to kill you," and shot her in the head again. The victim was subsequently pronounced dead at the hospital. In total, at least three shots were fired during the incident.
Leaving the scene of the shooting, the defendant returned to his mother's home. He gave the gun to her and said that he was going to turn himself in to the police. Following his surrender to the authorities, he gave a voluntary statement in which he gave a detailed account of the shooting and stated that he shot the victim for "disrespecting" him and his mother.
The defendant was indicted for second degree murder. He entered pleas of not guilty and not guilty by reason of insanity. A sanity commission was appointed, consisting of Dr. George Seiden, Dr. DeBora Murphy and Dr. Norman L. Mauroner. Dr. Mauroner was the only member of the commission to find that the defendant could not distinguish right from wrong at the time of the offense. This conclusion was based upon a "proposed" syndrome called "limbic psychotic trigger reaction." The state filed a motion in limine to prohibit the presentation of an "irresistible impulse" or "limbic psychotic trigger reaction" defense as being outside of the parameters of La. R.S. 14:14, which sets forth the sanity test recognized in Louisiana. The motion was granted. Although the appellate court reversed, the supreme court reinstated the trial court's ruling, as will be discussed in detail infra.
The jury returned a verdict of manslaughter, and the trial court sentenced the defendant to 25 years at hard labor. The defendant's oral motion for reconsideration of sentence was denied. He appealed, urging six assignments of error.

INSANITY DEFENSE

Dr. Mauroner's report and testimony
In two assignments of error, the defendant contends that the trial court erred in refusing to allow Dr. Mauroner to testify as to his opinion of the defendant's sanity and in refusing to allow the jury to view his report.
As previously mentioned, Dr. Mauroner, a member of the sanity commission, concluded that the defendant was not fully capable of distinguishing between right and wrong at the time of the shooting and cited Limbic Psychotic Trigger Reaction (LPTR) in support of his opinion. However, the trial court granted the state's motion in limine and concluded that the defendant could present no testimony regarding LPTR nor make any mention thereof.[2] The trial court applied the principles of Foret, infra, and Daubert, infra, to conclude that LPTR is an untested, unpublished theory with no known rate of error and that it is not a generally accepted theory in the scientific community. The defendant then applied for supervisory writs to this court. This court granted the writ with instructions.

WRIT GRANTED WITH INSTRUCTIONS. We agree that LPTR is not a tested and generally accepted theory. However, Dr. Mauroner has been accepted as an expert in forensic psychiatry and has formed an opinion concerning defendant's sanity under La. R.S. 14:14. As expert testimony, Dr. Mauroner's opinion on this question is admissible as is the basis for that opinion, all of which is subject to cross-examination.
The state then sought review by the Louisiana Supreme Court which granted writs, stating as follows:
Granted. The decision of the court of appeal is reversed, and the judgment of the district court is reinstated. To the *753 extent that the district court limited its ruling to preclude the defendant only from presenting any testimony concerning Limbic Psychotic Trigger Reaction or make "any mention thereof," the court properly exercised its gatekeeping function under Daubert v. Merrill[Merrell] Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
The defense subpoenaed Dr. Mauroner to testify at trial but elected not to call him to the stand in light of the supreme court's ruling. In so deciding, defense counsel stated, "I've decided that what Dr. Mauroner what the Supreme Court has said that what he can tell you, can't really testify to anything."
During the testimony of Dr. Murphy, another member of the sanity commission and a rebuttal witness for the state, a reference was made to Dr. Mauroner's report during direct examination. Specifically, Dr. Murphy indicated that she considered various information in forming her opinion, including a letter from defense counsel, the defendant's handwritten notes and the preliminary exam transcript. She was then asked if defense counsel had made any request of her in connection with this case. She recounted that defense counsel had told her that sanity was an issue as to whether the defendant was in a "quasi comatose state and did not perceive what he was doing." She then volunteered that defense counsel had sent her a copy of Dr. Mauroner's report and a letter in which he discussed Dr. Mauroner's opinion. He also sent her some literature for her review and asked if it was reconcilable with her report. On cross-examination, the defense attempted to show Dr. Mauroner's report to Dr. Murphy and question her about it. The state's objections were sustained. The trial court stated that in its gatekeeper function, it would not allow, directly or indirectly, Dr. Mauroner's opinion which was based "a hundred percent" on LPTR.
During its deliberations, the jury requested to see several exhibits, including Dr. Mauroner's report, which the defense had proffered. The trial court refused the jury's request as to the report.
The defendant contends that the trial court interpreted the supreme court's ruling too broadly and that it only barred reference to LPTR. He argues that the supreme court did not rule that the remaining portion of Dr. Mauroner's report would be inadmissible, nor did it rule that Dr. Mauroner's conclusion was inadmissible. The defendant further asserts that the state elicited testimony from Dr. Murphy regarding Dr. Mauroner's report and whether she considered the report in reaching her conclusion. Additionally, the defendant claims that neither the trial court nor the supreme court barred evidence of irresistible impulse, even though the state had sought such a bar in its motion in limine.
Review of Dr. Mauroner's report reveals that it is a two-page letter; on the first page, he opines that the defendant was competent to consult with his attorney. The second page contains brief one-paragraph recitations of the defendant's history with the victim and the doctor's observation during the mental status examination. In a one-sentence paragraph, the doctor opines that the defendant could not fully distinguish between right and wrong at the time of the offense. In support of this conclusion, he then refers to LPTR and lists 10 general symptoms of the proposed syndrome. He concludes by reciting the defendant's claim that the victim had a "very strange laugh" which became "an intrusive memory for him" and that the laugh triggered the homicide.
Defense counsel argues that the report could have been submitted to the jury with the portions referring to LPTR deleted. He also contends that, while the LPTR portion was not admissible under the supreme court's order, the "balance" of the report was admissible. However, these assertions ignore the simple reality *754 that LPTR was the sole basis for Dr. Mauroner's opinion that the defendant was unable to distinguish right from wrong. Pursuant to the Louisiana Supreme Court's ruling, Dr. Mauroner's conclusion and the facts in support of it were inadmissible. Removal of that information from his report would have rendered the remaining portion meaningless.
Furthermore, as evidenced by the trial testimony, the state did not open up this area by eliciting testimony on direct examination of Dr. Murphy concerning Dr. Mauroner's report. The report mentioned LPTR which was inadmissible and the report was hearsay evidence. Moreover, the trial court did not err in refusing the jury's request to view Dr. Mauroner's report during its deliberations.
These assignments of error lack merit.

Daubert/Foret claim
By this assignment of error, the defendant contends that he was denied equal protection of the law by the Louisiana Supreme Court's decision in State v. Foret, 628 So.2d 1116 (La.1993), to utilize the reasoning of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), in criminal cases.
The decision to accept into evidence or reject therefrom the testimony of an expert witness rests within the sound discretion of the trial court. La. C.E. art. 702, official comment (d); State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865, cert. denied, 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997).
The insanity defense is set forth in La. R.S. 14:14.
If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility.
La. C.E. art. 702 permits the use of expert testimony if scientific, technical or specialized knowledge will assist the trier of fact to determine a fact in issue. The expert testimony, however, must "rise to a threshold level of reliability in order to be admissible under La. C.E. art. 702." State v. Foret, supra. There, the court found reversible error in the admission of testimony concerning Child Sexual Abuse Accommodation Syndrome because the supposed syndrome did not unequivocally meet the tests for scientific reliability set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., supra.
The reliability of expert testimony can be examined under four suggested factors from Daubert: (1) whether the reasoning or methodology underlying the testimony is scientifically valid, i.e., whether it can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory enjoys "general acceptance" within the relevant scientific community. 113 S.Ct. at 2796-97.
The right of a defendant to present a defense is not violated by the application of a rule which excludes from evidence that which is not based on sound scientific grounds. United States v. Scheffer, 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998).
The defendant maintains that in a majority of states, the M'Naughten Rule does not apply. He asserts that the effect of Daubert is less repressive on their right to present a defense. However, according to the defendant, the combination of Daubert and the M'Naughten Rule in Louisiana operates to prevent him from presenting to the jury any evidence of temporary insanity, in addition to LPTR and diminished capacity. The defendant claims that the effect of Daubert is to penalize him for living in Louisiana, a direct violation of due process and equal protection.
*755 In support of his contention, the defendant quotes Berrigan, La.Crim. Trial Prac. (2nd Ed.), § 21-16, which states, in part:
§ 21-16 Insanity as defense
By statute, an offender is exempt from criminal responsibility for his behavior if he "was incapable of distinguishing between right and wrong" because of a "mental disease or mental defect." This is a codification of the so-called M'Naughten Rule, which by some modern standards is considered outmoded and archaic. Louisiana is among a minority of states still holding to this rule and the courts rigorously enforce it, along with its limitations. Diminished capacity does not constitute legal insanity nor does the concept of irresistible impulse. A defendant is not relieved of responsibility for his acts unless he is incapable of distinguishing right from wrong.
The state maintains that under Louisiana law, the defendant is entitled to present a specific, reliable, tested, accepted, scientific defense. For support, the state cites several cases including Daubert, supra; Foret, supra; and State v. Wilson, 28,403 (La.App.2d Cir.8/21/96), 679 So.2d 963. The state also notes that the defendant is an Arkansas resident who chose to commit a crime in Louisiana.
The defendant has cited no cases in support of his argument. This court is bound to follow the law and jurisprudence of this state regarding the introduction of expert testimony and the defense of insanity. Furthermore, the testimony presented at the motion in limine adequately demonstrated that LPTR is not accepted as a diagnosis in the mental health community.
This assignment of error is meritless.

CLOSING ARGUMENT
The defendant contends in this assignment of error that the trial court erred in sustaining the state's objection during the defense's closing argument.
During the defense's closing argument, the following exchange occurred:
MR. KIDD: ... That is that he had such a mental defect or disease that he didn't know the difference between right and wrong. If then it's proved to you that the mind of the accused was unsound or possessed a mental defect the question becomes whether the unsound mind or mental defect existed to such an extent that for the time being it overpowered reason, conscious, judgment and whether the accused in committing the homicide acted from an uncontrollable and irresistible compulsion. If so then the act was not a voluntary
MS. ALFORD: Excuse me. Your Honor, may we approach the bench?
THE COURT: Well, are you objecting at this point?
MS. ALFORD: Yes, sir.
THE COURT: I'm going to sustain the objection. Argue to the jury, Mr. Kidd. Don't quote them law or what you feel is some legal principle or something.
MR. KIDD: I'll sit down.
THE COURT: Mr. Kidd, are you through with your closing?
MR. KIDD: I'm not, but I can't argue the Court says.
THE COURT: No. I said you can argue you [can't] argue a law. That's exactly what I'm saying. But you can argue facts to the jury. Now, you want to argue facts to the jury or not?
MR. KIDD: I would like to argue what I'mwhat's the State been arguing. The State has argued law all in her opening statement.
THE COURT: You canyou can tell them what the law is but you can't tell them whatwhat's your opinion of that law.
MS. ALFORD: Your Honor, that was my objection. Was that it was a misstatement of the law.

*756 THE COURT: Now, you want to continue arguing, Mr. Kidd?
MR. KIDD: I want to Judge, but I want to befollow the law.
THE COURT: Well, now I'm not stopping you from arguing. So if you want to argue, this is your time.
MR. KIDD: Because you've sustained the State's objection, I retire.
The court then allowed the state to proceed with its rebuttal argument. Near the conclusion of rebuttal argument, the trial court interrupted and called a brief recess. When court resumed, the court notedout of the jury's presencethat it had met with counsel in chambers and urged defense counsel, who "had apparently gotten mad and stopped his closing argument" after the court sustained the state's objection, to continue.
THE COURT: ... So Mr. Kidd, really I'm just asking you if you want to take advantage of this opportunity or not?
MR. KIDD: Judge, I wanted to first of all state that throughout this trial I've been prevented from presenting anything to effectively present a defense for Mr. George. Primarily that relating to why the Supreme Court ruled the way it did on the writ and not going into that. But each time that I get started on my explanation or try to get close to this point I was overruled or objection was sustained about it. Now, I think it's important to consider what I was talking about. Apparently nobody was listening very closely at the context of what I was saying. And I have, because I was reading, you noted that I was reading.
THE COURT: You were reading.
MR. KIDD: And what I was reading
THE COURT: In fact it was not only obvious to me and the State prosecutor, it was obvious to the jury as well. Go ahead. But your reading something, right?
MR. KIDD: Yes. And it's true but whatwhat I was reading was following the caption, your choices of manslaughter, not guilty and not guilty by reason of insanity. And what I was saying was that they had a choice if they reached the decision there's reasonable doubt about the intent of Mr. George for manslaughter or heat of passion. Then they had two things to consider. One thing was not guilty. The other thing was not guilty by reason of insanity. And then I went in and started reading and I was on the issue. On the point when the objection came. I was talking about the lack of intent and the Court sustains the objection of the State thinking I'm talking about insanity.
THE COURT: No. Don't supply the reason I sustained the objection. It was obvious you were reading from some legal principle that you had in your notes.
MR. KIDD: No, sir. I was reading from a remark made by a author named McLeash and I was talking about intent, not about insanity. But the objection was made by the State and I have it printed here and I want to introduce it into the record that it clearly reflects notI didn'tI was not going to say legal insanity. I was talking about intent. I have
. . . .
MR. KIDD: Then I was going to this paragraph and this is what I was reading. If then it is proved to you that the mind of the accused was unsound or possessed a mental defect the question becomes whether that unsound mind or mental defect existed to such an extent that for the time being it overpowered reason, conscious judgment and whether the accused in committing the homicide, acted from an uncontrollable and irresistible compulsion. That's the time she objected. If so then the act was not a voluntary agent but the involuntary act of the body without the concurrence of the mind directing it. Now, that's nothing to do with insanity.
THE COURT: So you're reading

*757 MR. KIDD: It's the same thing as insanity but it's not the same thing on intent.
MS. ALFORD: That is a misstatement of the law and I let him get to telling the jury that insanity was a irresistible impulse before I objected.
The defendant contends that the jury had to decide issues pertaining to intent as well as issues pertaining to insanity. He argues that to refuse to allow the defense closing argument, even in a non-jury trial, is reversible error, violating the Sixth Amendment to the United States Constitution as well as Article I, Section 13 of the Louisiana Constitution, guaranteeing an accused his right to the assistance of counsel. Furthermore, the defendant contends that a wide latitude is generally allowed counsel in closing argument and any undue restriction which limits argument to the prejudice of the defense is error. The defendant further argues that reversal is warranted where the prejudice is substantial, citing State v. Joseph, 341 So.2d 861 (La.1977), and State v. Boykin, 29,141 (La. App.2d Cir.1/31/97), 688 So.2d 1250.
While intent is an issue in a prosecution for second degree murder or manslaughter, the transcript in the instant case shows that the defendant was not arguing intent at the time of the objection, but rather the defense of insanity. The legislature has expressly adopted the M'Naughten test of insanity through La. R.S. 14:14. That statute, as mentioned previously, provides that "[i]f the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility." In State v. Berry, 324 So.2d 822 (La.1975), cert. denied, 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976), the supreme court held that "this legislative choice does not admit of judicial substitution of another test allegedly more scientifically based on modern psychiatric knowledge." Thus, under the law and jurisprudence of this state, the defendant cannot claim the defense of irresistible impulse. State v. Johanson, 332 So.2d 270 (La.1976); State v. Berry, supra; State v. Frezal, 278 So.2d 64 (La.1973).
Thus, the trial court did not err in sustaining the state's objection to the defendant's closing argument. The defendant was attempting to argue the defense of irresistible impulse to the jury, and not intent. Moreover, the trial court did not refuse Mr. Kidd his right to give a closing argument. Rather, Mr. Kidd chose not to continue with his closing argument.
This assignment of error is without merit.

MOTION TO RECUSE
By this assignment of error, the defendant contends that the trial court erred in refusing to hold a hearing on his motion to recuse the district attorney and in denying his motion.
This case was prosecuted by two assistant district attorneys (ADA); however, according to the defendant, the district attorney himself periodically appeared in court to view the proceedings and he was present at the counsel table when the jury returned its verdict. The defendant alleges that after the jury returned the responsive verdict of guilty of manslaughter, the district attorney angrily delivered a 30-minute "harangue" to the jurors on how they had returned an improper verdict. At the same time, an ADA sought in court to revoke the defendant's bail and later sent the judge a letter again seeking the same.
The defendant filed a motion to recuse the district attorney's office. He asserts that the district attorney's, conduct at the end of the trial demonstrated that he is not capable of impartially prosecuting this case through the appellate process and any possible retrial. In support of his motion, the defendant cites La.C.Cr.P. art. 680(1) which provides that "[a] district attorney *758 shall be recused when he ... [h]as a personal interest in the cause or grand jury proceeding which is in conflict with fair and impartial administration of justice." The defendant further contends that the trial court erred in not conducting a hearing on the recusal motion when La.C.Cr.P. art. 681 provides that a motion to recuse "shall be tried in a contradictory hearing."
The trial court denied the defendant's motion, determining that even if the defendant's allegations in his motion were true, they were not sufficient as a basis for recusal. Thus, the trial court did not conduct a hearing on the defendant's motion to recuse.
A district attorney shall be recused when he has a personal interest in the cause or grand jury proceeding which is in conflict with fair and impartial administration of justice. La.C.Cr.P. art. 680(1). The burden of proving a personal interest under art. 680(1) rests with the defendant, who must prove it by a preponderance of the evidence. State v. Bourque, 622 So.2d 198 (La.1993) (overruled on other grounds). Courts have required recusal under this article when it is shown that the district attorney has a personal interest in the defendant's case based upon a business relationship with the defendant, personal animosity between the district attorney and the defendant, and the district attorney's victimization by the criminal activity subject to investigation. State v. Hughes, 587 So.2d 31 (La.App. 2d Cir.1991), writ denied, 590 So.2d 1197 (La.1992); Parkerson v. Norris, 529 So.2d 1392 (La.App. 2d Cir.1988), writ denied, 530 So.2d 552 (La. 1988); State v. Snyder, 256 La. 601, 237 So.2d 392 (1970). See also State v. Vaccaro, 411 So.2d 415 (La.1982); State v. Gatch, 27,701 (La.App.2d Cir.2/28/96), 669 So.2d 676, writ denied, 96-0810 (La.9/20/96), 679 So.2d 429.
The trial court did not err in finding that the defendant failed to establish a case for recusal under La.C.Cr.P. art. 680(1). Specifically, even assuming arguendo that the defendant's allegations were true, the defendant did not show by a preponderance of the evidence that the district attorney had a personal interest in this case with the effect of conflicting with the fair and impartial administration of justice.
This assignment of error is without merit.

EXCESSIVE SENTENCE
The defendant argues that the trial court erred in imposing an excessive sentence. Specifically, he contends that the trial court erred in considering that the facts presented at trial would have readily supported a verdict of second degree murder and in not considering probation an acceptable sentence for manslaughter.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La.C.Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Dunn, 30,767 (La.App.2d Cir.6/24/98), 715 So.2d 641. The articulation of the factual basis for a sentence is the goal of La. C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La.C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Bradford, 29,519 (La.App.2d Cir.4/2/97), 691 So.2d 864; State v. Hudgins, 519 So.2d 400 (La.App. 2d Cir.1988), writ denied, 521 *759 So.2d 1143 (La.1988). There is no requirement that specific matters be given any particular weight at sentencing. State v. Jones, 33,111 (La.App.2d Cir.3/1/00), 754 So.2d 392; State v. Callahan, 29,351 (La. App.2d Cir.2/26/97), 690 So.2d 864, writ denied, 97-0705 (La.9/26/97), 701 So.2d 979.
Secondly, whether the sentence imposed is too severe depends on the circumstances of the case and the background of the defendant. A sentence violates La. Const. Art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Bradford, supra.
A trial court has wide discretion to sentence within the statutory limits. Absent a showing of manifest abuse of that discretion, we will not set aside a sentence as excessive. State v. Square, 433 So.2d 104 (La.1983); State v. Washington, 29,478 (La.App.2d Cir.4/2/97), 691 So.2d 345.
A trial court is not required to render a suspended sentence or probation on a first felony offense. The judge may consider whatever factors and evidence he deems important to a determination of the best interest of the public and the defendant. State v. Bradford, supra; State v. Woodman, 28,004 (La.App.2d Cir.1/24/96), 666 So.2d 1255, writ denied, 96-0489 (La.5/3/96), 672 So.2d 696.
The defendant made only an oral objection to the sentence complaining that it was excessive. Therefore, the defendant is relegated merely to a claim of constitutional excessiveness. State v. Mims, 619 So.2d 1059 (La.1993); State v. McEachern, 624 So.2d 43 (La.App. 2d Cir.1993).
At the beginning of sentencing, the trial court noted that the defendant was being sentenced on the charge of manslaughter. The trial court further noted that it had received a presentence investigation report (PSI) which detailed the background of this 40-year-old defendant, including his employment history as a truck driver and his honorary discharge from the service. At the onset, the trial court noted that it considered the factors listed in La.C.Cr.P. art. 894.1, and concluded that probation was not appropriate in a case involving a human life. The trial court considered the following: the defendant used the ultimate violence in the commission of this offense; the offense resulted in the death of a person; the defendant used a dangerous weapon in the commission of the offense; the defendant could foresee that human life would be endangered by discharging a firearm; the defendant used a firearm in the commission of the offense; the defendant shot the victim over two hours after he had a confrontation with her and that a reasonable person's blood would have cooled during that period; and the evidence was sufficient to convict the defendant of second degree murder.
The trial court then considered the following mitigating circumstances: the defendant had no prior criminal history; and the victim provoked the defendant.
The trial court concluded that the defendant was in need of correctional treatment or custodial environment that can be provided most effectively by his commitment to an institution and therefore imposed a sentence of imprisonment. The trial court also concluded that a lesser sentence would deprecate the seriousness of the crime. The trial court noted that the defendant committed a grievous offense which took the life of a young woman who was the mother of two children.
Considering the reasons for sentencing given by the trial court and the circumstances of this offense, this court cannot *760 say that the trial court abused its great discretion in sentencing the defendant to 25 years at hard labor. The maximum sentence for manslaughter is 40 years at hard labor. La. R.S. 14:31. The record evidences that the trial court took into consideration both aggravating and mitigating circumstances in tailoring the sentence to this particular defendant.
Furthermore, the fact that the evidence might have supported a verdict of second degree murder was an appropriate sentencing consideration by the trial court. See State v. Jasper, 28,187 (La.App.2d Cir.6/26/96), 677 So.2d 553, writ denied, 96-1897 (La.2/21/97), 688 So.2d 521; State v. Carrier, 95-1003 (La.App. 3d Cir.3/6/96), 670 So.2d 794, writ denied, 96-0881 (La.9/20/96), 679 So.2d 431; State v. Jones, 593 So.2d 1301 (La.App. 1st Cir.1991). Also, the trial court concluded that a probated sentence was not justified under the circumstance of this particular case. The record is clear that the trial court properly considered the factors of this case in determining that a probated sentence was not appropriate.
This assignment of error is without merit.

ERROR PATENT
At sentencing, the trial court advised the defendant that he had three years from the date his conviction becomes final to apply for post-conviction relief. At the time sentence was imposed, the three-year time period was correct but the statute providing for this time period has been amended to reduce the period to two years. Because this amendment affects the defendant, we direct the trial court, within 30 days from the rendition of this opinion, to provide him with accurate notice of La.C.Cr.P. art. 930.8 as amended and to file proof of receipt of the notice into the record. State v. Lane, 33,059 (La.App.2d Cir.3/3/00), 755 So.2d 368; State v. Butler, 33,403 (La.App.2d Cir.5/10/00), 760 So.2d 620.

CONCLUSION
The defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] In the record, the victim is also referred to as Dewanda or Wanda.
[2] The testimony presented at the hearing on the motion in limine indicated that LPTR is a diagnosis proposed in medical literature in 1981 by a Dr. Pontius. Apparently, there are very few articles on the topic and they are all by Dr. Pontius. In his testimony, Dr. Mauroner acknowledged that LPTR is not a scientifically recognized diagnosis.