STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

15-500


CHRISTINA MARIE RICHARD SORRELLS

VERSUS

STEVEN RAY SORRELLS


**********

APPEAL FROM THE
THIRTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF CAMERON, NO. 10-19164
HONORABLE PENELOPE RICHARD, DISTRICT JUDGE

**********

**PHYLLIS M. KEATY**
**JUDGE**

**********

Court composed of James T. Genovese, Shannon J. Gremillion, and Phyllis M. Keaty, Judges.


**AFFIRMED.**


**John Green, Jr.**
**Attorney at Law**
**1135 Hodges Street**
**Lake Charles, Louisiana 70601**
**(337) 990-0060**
**Counsel for Plaintiff/Appellant:**
         **Christina Marie Richard Sorrells**

**Jonathan L. Johnson**
**Johnson & Vercher L.L.C.**
**Post Office Box 849**
**Lake Charles, Louisiana  70602**
**(337) 433-1414**
**Counsel for Defendant/Appellee:**
**        Steven Ray Sorrells**

**KEATY, Judge.**

Plaintiff/Appellant, Christina Marie Richard Sorrells, appeals the trial court's custody judgment. For the following reasons, the trial court's judgment is affirmed.

## FACTS AND PROCEDURAL BACKGROUND

This matter involves a child custody dispute between Christina and Defendant/Appellee, Steven Ray Sorrells, regarding their minor children: sixteen-year-old Hunter Sorrells (male); fourteen-year-old Chelsea Sorrells (female); and, eight-year-old Konner Sorrells (male). On March 26, 2013, Christina filed a Petition for Divorce. On April 4, 2013, Steven also filed a Petition for Divorce pursuant to La.Civ.Code art. 103(2),[1] alleging that Christina was having an affair with Vernon O'Quinn. Following a hearing on April 17, 2013, the trial court orally granted Steven's divorce. In open court, the parties also stipulated to temporary joint custody whereby Hunter would primarily live with Steven, who was designated as his domiciliary parent. Chelsea and Konner would primarily live with Christina, who was designated as their domiciliary parent. A temporary visitation schedule was also agreed upon, and everything was reduced to writing pursuant to the trial court's signed Judgment dated July 10, 2013.

On October 25, 2013, Steven filed a Rule for Custody or In the Alternative to Modify Custody. He alleged that a material change in circumstances occurred since the temporary custody order such that it was in their children's best interest to have him designated as their domiciliary parent. He further asked for joint custody with Christina having reasonable visitation rights. Christina filed an

---

[1] Louisiana Civil Code Article 103(2) provides that a divorce judgment will be granted when "[t]he other spouse has committed adultery."

Answer and Reconventional Demand on December 13, 2013, stating that Chelsea and Konner should remain living with her and that she be designated as the domiciliary parent of all three children with Steven having supervised visitation rights. After a hearing on January 22, 2014, the trial court dismissed their previous custody modifications and made the temporary joint custody order rendered on July 10, 2013, a permanent order. This was reduced to writing pursuant to the trial court's Judgment signed on August 20, 2014.

On September 11, 2014, Steven filed a Petition for Change of Custody, alleging that a material change in circumstances occurred such that he should be designated as Chelsea and Konner's domiciliary parent. Following trial on December 2, 2014, and December 30, 2014, the trial court made the following ruling in its written Judgment signed on March 9, 2015. The parties were awarded shared custody of their minor children, Chelsea and Konner,[2] with Steven being designated as their domiciliary parent, subject to Christina's visitation rights pursuant to an attached shared custody plan. Steven remained Hunter's "custodial parent." The minor children were to live with Steven from Monday through Thursday and with Christina from Thursday until Sunday evening or Monday morning. The only exception was that one weekend a month, Steven would have access from Friday through Sunday. It was ordered that all three children were to have "no access or contact" with Vernon O'Quinn, who was now Christina's boyfriend. Christina and the children were ordered to attend counseling, and the trial court determined child support awards. Christina appealed.

On appeal, Christina asserts the following four assignments of error:

_____

[2] At the time of trial, Hunter had turned eighteen years old, so he was no longer a minor.

(1)    The trial court erred by allowing an internal affairs report (IA Report) from the Lake Charles Police Department (LCPD) regarding its former employee, Vernon, to be introduced into evidence and used when cross-examining witnesses;

(2)    The trial court erred by conducting an in-chambers interview with Chelsea and Konner, both minors, without having a court reporter present to make a record of the proceedings;

(3)    The trial court erred by allowing Defendant's counsel to use profanity and abusive language, inappropriately comment on witness testimony, and ask questions with the intent to embarrass the witnesses;

(4)    The trial court improperly conditioned Christina's visitation rights by ordering that the minor children were to have no contact with Vernon, her then fiancé and now husband, and with whom she was residing.[3]

## STANDARD OF REVIEW

The standard of review regarding modification of child custody was discussed by this court in *McManus v. McManus*, 13-699, p. 3 (La.App. 3 Cir. 12/11/13), 127 So.3d 1093, 1095, as follows:

> In reviewing child custody determinations, the trial court's decision "'is to be afforded great deference on appeal and will not be disturbed absent a clear abuse of discretion.'" *Martin v. Martin*, 11-1496, p. 2 (La.App. 3 Cir. 5/16/12), 89 So.3d 526, 528 (quoting *Franklin v. Franklin*, 99-1738 (La.App. 3 Cir. 5/24/00), 763 So.2d 759). Louisiana Civil Code Article 131 directs that "[i]n a proceeding for divorce or thereafter, the court shall award custody of a child in accordance with the best interest of the child." As such, custody cases are to be decided upon their "own particular facts and circumstances," keeping in mind that "the paramount goal is to do what is in the best interest of the minor children." *Hebert v. Blanchard*, 97-550, p. 4 (La.App. 3 Cir. 10/29/97), 702 So.2d 1102, 1105.

We will, therefore, use the abuse of discretion standard of review.

---

[3] The record indicates that Vernon and Christina were only living together and not married at the time of trial. According to Christina's brief, however, they were subsequently married following trial.

## DISCUSSION

### I.    Internal Affairs Report

In her first assignment of error, Christina contends that the trial court erred by allowing the introduction of the LCPD's IA Report since it was inadmissible hearsay.   "'Hearsay' is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La.Code Evid. art. 801(C).  Public records and reports are an exception to and are not excluded by the hearsay rule pursuant to La.Code Evid. art. 803(8)(a).  Christina alleges, however, that the IA Report is excluded from the exception to the hearsay rule pursuant to La.Code Evid. art. 803(8)(b), which provides:

> Except as specifically provided otherwise by legislation, the following are excluded from this exception to the hearsay rule:
>
> (i)    Investigative reports by police and other law enforcement personnel . . . .
>
> . . . .
>
> (iv) Factual findings resulting from investigation of a particular complaint, case, or incident, including an investigation into the facts and circumstances on which the present proceeding is based or an investigation into a similar occurrence or occurrences.

Christina further contends that the trial court erred in allowing Steven's counsel to use the IA Report during the cross-examination of her and Vernon since police reports and medical testing are inadmissible without proper authentication and foundation.  In support, she cites *Bandy v. Bandy*, 07-849, pp. 9-10 (La.App. 3 Cir. 12/5/07), 971 So.2d 456, 461-62, wherein this court held:

> More specifically, without authentication and a proper foundation, the drug test results should have been excluded as hearsay under Article 803(6) of the Code of Evidence, and the police reports should have been excluded under Article 803(b)([i]). . . .

. . . .

In the present case, Patrick represented himself and introduced the drug test results into evidence without calling a single witness to testify as to their authenticity and to the practices under which the information was gathered.

In opposition, Steven contends that the IA Report was introduced as impeachment evidence after Vernon was untruthful as to the reason why he was no longer employed by the LCPD. Steven alleges that it was properly admitted as extrinsic evidence pursuant to La.Code Evid. art. 613 which provides:

> Except as the interests of justice otherwise require, extrinsic evidence of bias, interest, or corruption, prior inconsistent statements, conviction of crime, or defects of capacity is admissible after the proponent has first fairly directed the witness' attention to the statement, act, or matter alleged, and the witness has been given the opportunity to admit the fact and has failed distinctly to do so.

The IA Report is a compilation of photographs, statements, correspondence, police reports, DNA and polygraph test results, LCPD case notes, and settlement documents surrounding an administrative investigation arising from sexual assault allegations made by Judy Bellard against Vernon while he was employed by the LCPD. The police report shows that Bellard accused Vernon of forcing her to perform oral sex on him on November 25, 2005, while he was on duty. She alleged that this occurred inside of a vacant house located in Lake Charles. She stated that after Vernon ejaculated in her mouth and left, she placed his semen into a plastic bag and brought it to the police station. In his statement, Vernon agreed that his semen could be found at the vacant house although his version of events differed. He stated that after entering the vacant house, he found a pornographic magazine. He said that he assumed that he was alone and, therefore, masturbated, ejaculated on the floor, and left. The DNA analysis revealed that a DNA swab taken from Vernon matched the DNA found in the semen that Bellard brought to

5

the police station. The polygraph test shows that Vernon was not being truthful about Bellard performing oral sex on him. Correspondence from the City of Lake Charles reveals that Vernon was placed on paid administrative leave on December 1, 2005, pending an investigation into Bellard's allegations. Following the investigation, the LCPD case notes dated December 23, 2005, reveal that Vernon was found to have violated the following LCPD rules: (1) conduct unbecoming of an officer; (2) neglect of duty; (3) false or inaccurate reports, and; (4) truthfulness. The settlement documents contain a Receipt and Release dated July 25, 2006, wherein Bellard was paid $90,000 to dismiss her federal civil lawsuit with prejudice against the City of Lake Charles, Vernon, and Donald Dixon, the LCPD Police Chief. Of this $90,000, the City of Lake Charles paid $83,200 and Vernon paid $6,800. The parties agreed that the settlement constituted a compromise of the disputed claims and that the $90,000 payment was not to be construed as any admissions of fault or liability on the part of Vernon or his co-defendants.

Based on the IA Report, Vernon's departure from the LCPD arose from Bellard's allegations and subsequent investigation. Vernon, however, was untruthful as to the reasons surrounding his departure as shown in his trial testimony taken on December 30, 2014. The transcript shows that Steven's counsel questioned him multiple times as to the reason for departure. Steven's counsel asked Vernon about the length of time he was employed by the LCPD. Vernon testified that he was employed from 2004 through 2006 until he "went from [the] LCPD back to running a crane." His testimony indicates that he left the LCPD because he was paid more as a crane operator. This is shown when Steven's counsel asked Vernon if "cranes pay better" and he responded, "[y]eah, about $38 an hour." Steven's counsel then asked: "So after two years of civil

6

service work, you decided to go make more money somewhere else?" In response, Vernon replied, "[r]ight." Steven's counsel asked Vernon whether he left the LCPD "for a better opportunity in [20]06," and he replied, "[y]eah."

Steven's counsel asked Vernon whether he was "ever fired from any job[,]" and he replied: "No. Well -- no, I don't think. Not that I can remember." Vernon continued denying that he was ever fired or forced to leave any job. Vernon testified that it was always his "own decision" to leave a job and that he has "always been able to decide whether or not [he] want[ed] to stay or leave." Steven's counsel asked whether the LCPD was dissatisfied with him when he left, and his response was, "[w]hen I left [the] LCPD, it was for financial reasons."

Vernon's testimony changed when he was subsequently confronted with the IA Report at trial. When Steven's counsel asked Vernon to identify the IA Report, he responded: "It's an Internal Affairs case report . . .[, and] I was given instructions that this was never to be spoke[n] about again . . . [and] that it was a sealed document that I would never have to discuss again." The foregoing response shows that he knew about the IA Report at trial and that he was less than truthful regarding his departure from the LCPD.

Vernon's untruthfulness impacted the trial court's decision to allow the IA Report into evidence in order to attack his credibility. This is evident when the trial court said, "I wrote it down. [Vernon] said, 'I always had a choice to stay or leave a job[,]'" and that allowing it into evidence "goes to his character and it goes to his credibility." In its oral ruling following the December 30, 2014 trial, the trial court stated: "I didn't find [Vernon] credible at all. I'm concerned about [Christina's] denial about the allegations and the things her children are saying about [Vernon]. That's a real big concern that I have."

7

Based on the above testimony and evidence, the trial court correctly allowed the IA Report into evidence since it was used extrinsically to impeach Vernon's credibility and not to prove the truth of the facts contained within. The transcript shows that it was admitted only after Steven's counsel directed Vernon's attention to the circumstances surrounding his departure from the LCPD. He was given multiple opportunities to admit the truth concerning his departure which he failed to do.

The use of hearsay documents used as extrinsic evidence to impeach a witness was discussed in *Evangelista v. U.S. Welding Service, Inc*., 03-2824 (La.App. 1 Cir. 12/30/04), 898 So.2d 438. Therein, the defendant in the initial trial denied having filed a police report against the plaintiff. In ruling against the plaintiff, the trial court stated that its holding was based upon which side it believed. The plaintiff subsequently filed a motion for a new trial, attaching to it a police report that the defendant previously filed against the plaintiff and which the defendant lied about during the initial trial. The trial court denied the motion for a new trial, and the plaintiff appealed. On appeal, defense counsel stated that the trial court did not abuse its discretion in denying the motion and that police reports are inadmissible hearsay. In reversing and remanding the matter, the appellate court stated:

> Our examination of the facts and circumstances of this case convinces us that the trial court's denial of a new trial was a clear abuse of its discretion resulting in a miscarriage of justice, given the existence of the evidence raised in plaintiff's motion that impacted directed [sic] on the credibility of Mr. Porche, a key witness in this matter. As noted, a review of the witness statement he gave to the police reveals that it contains several statements inconsistent with his trial testimony. Moreover, these inconsistencies relate to issues that go directly to the core of plaintiff's claims. As the trial court specifically recognized in rendering judgment for defendant, this case turned largely on the court's credibility determinations. Under these circumstances, we

8

conclude the trial court's denial of a new trial was a manifest abuse of its discretion.

*Id*. at 442.

The IA Report in this case directly impacted Vernon's credibility just as in *Evangelista*, 898 So.2d 438. A review of Vernon's trial court testimony is inconsistent with the IA Report regarding the events surrounding his departure from the LCPD. These inconsistencies relate to issues that go directly to the core of Steven's child custody claims.

The trial court found that the IA Report was an exception to the hearsay rule. We also observe that evidentiary rules are somewhat relaxed in child custody matters. *See* La.Code Evid. art. 1101(B)(2). Accordingly, we find that the trial court did not abuse its discretion in allowing the introduction of the IA Report as it was extrinsic evidence used to attack Vernon's credibility.

## II.    Cross-Examination & In-Chambers Interview

In her second assignment of error, Christina contends that the trial court erred by having an in-chambers interview with Chelsea and Konner, both minors, without having a court reporter present to make a record of the proceedings. "[T]he law in this circuit requires that an 'in chambers' interview of a child in a child custody case '*must* be conducted with a reporter present and a record made of the questioning by the court and the answers of the witnesses.'" *Hicks v. Hicks*, 98-1527, p. 9 (La.App. 3 Cir. 5/19/99), 733 So.2d 1261, 1267 (quoting *Dykes v. Dykes*, 488 So.2d 368, 371 (La.App. 3 Cir.), *writ denied*, 489 So.2d 1278 (La.1986)). Christina alleges that the trial court inappropriately allowed Steven's counsel to use Chelsea and Konner's unrecorded answers during her cross-

9

examination. She further contends that the trial court's ruling was partially based on information obtained from the in-chambers interview.

The transcript refutes her assertion by showing that the trial court knew that it could not consider information obtained from the unrecorded in-chambers interview. Jurisprudence also shows that the trial court had authority to proceed. In *Watermeier v. Watermeier*, 462 So.2d 1272 (La.App. 5 Cir.), *writ denied*, 464 So.2d 301 (La.1985), the issue was whether, during a custody hearing and over the objection of counsel for one of the parties, the trial court could conduct an unrecorded, in-chambers interview of the minor children. The fifth circuit held that since there was an objection, the trial court should not have conducted the in-chambers interview. It further held that had there been no objection, however, the trial court could have proceeded with the unrecorded, in-chambers interview. Specifically, it stated:

> We do not intend or direct that the above procedure is ordained or is mandatory when there is no objection from either side regarding the examination of any child by the judge. In such case, the trial judge may examine any child or witness in chambers, on or off the record, and with or without parents and/or counsel being present— provided all agree on the procedure.

*Id.* at 1275.

Christina contends that the trial court erred by letting Steven's counsel question her during cross-examination with information obtained from Chelsea's in-chambers interview. Christina alleges that during the in-chambers interview, Chelsea said that she would rather attend school in Hackberry than Sulphur. Steven's counsel's use of that information during her cross-examination was, therefore, inappropriate according to Christina. The record refutes her contention by showing that Chelsea actually testified to the same thing at trial, i.e., that she

10

wants to attend school in Hackberry rather than Sulphur. Since Chelsea's trial testimony and the information obtained from her in-chambers interview is consistent, Steven's use of that information during Christina's cross-examination was not inappropriate.

Christina further contends that the trial court erred by relying on information obtained from Konner's in-chambers interview since he never testified at trial. Once again, the record refutes her assertion. The trial court's oral ruling is void of any reference to the children's, much less Konner's, in-chambers interview. Additionally, Konner's name is only mentioned in the oral ruling when the trial court orders counseling for all of the children. This is in contrast to the majority of the oral ruling wherein the trial court specifically mentions Chelsea's and Hunter's names when referencing their trial testimony. The oral ruling further states that the trial court did not like how the kids were split up. This supports Hunter's trial testimony that if Chelsea and Konner lived in Hackberry with their father, it would have a positive effect on the entire family and that Chelsea and Konner "would like that a lot." The trial court, therefore, did not base its custody determination on the children's in-chamber interviews.

Although a trial court may improperly interview a child in chambers, it is not necessarily reversible error if the trial court did not rely on the exchange, and there was sufficient evidence in the record for the trial court's ruling. Accordingly, the trial court did not abuse its discretion in this regard.

### III. Courtroom Decorum

In her third assignment of error, Christina contends that the trial court erred by allowing Steven's counsel to disrespect her and Vernon by using profanity and abusive language, inappropriately comment on their testimony, and ask questions

with the intent to embarrass them. Christina asserts that the foregoing violates Louisiana's Rules of Professional Conduct, including Rule 4.4(a), which provides that "a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person[.]" In support, Christina provides pages of trial testimony wherein Vernon was questioned about the oral sex incident, attempting to show that it was abusive, insulting, and embarrassing. We find that although Steven's use of the IA Report may have been embarrassing given the subject matter contained therein, it was not submitted for the purpose of embarrassing him.

The admissibility of a witness's arrest records in order to attack credibility is generally prohibited under La.Code Evid. art. 609(F) although there are some exceptions. Louisiana Code of Evidence Article 1101(B)(2) provides for the limited applicability of the rules concerning the admissibility of evidence in child custody cases. "The specific exclusionary rules and other provisions, however, shall be applied only to the extent that they tend to promote the purposes of the proceeding." *Id*. "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation." La.Code Evid. art. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La.Code Evid. art. 401.

The admissibility of testimony in a child custody case regarding a parent's arrest was discussed by this court in *L.E.P.S. v. R.G.P.*, 08-1349 (La.App. 3 Cir. 6/3/09), 11 So.3d 633, *writ denied*, 09-1429 (La. 7/1/09), 11 So.3d 498, a case that is factually similar to this case. In *L.E.P.S.*, the plaintiff mother appealed the trial

12

court's judgment in favor of the defendant father, who was named primary domiciliary custodial parent of their triplet daughters. This court reversed and remanded the matter based upon the trial court's failure to allow the testimony provided by a deputy and the father regarding the father's arrest for carnal knowledge of a juvenile. We held:

> Appellate courts have held that a parent's arrests are relevant to their moral fitness to parent a child. . . .
>
> . . . .
>
> Accordingly, we find the testimony and records concerning R.G.P.'s arrest in March 2008, for carnal knowledge of a juvenile (Tensas Parish) and contributing to the delinquency of a juvenile (Franklin Parish) should have been properly admitted. The fact that R.G.P. was arrested for having sex with a fifteen-year-old girl following a night of mud-riding at his camp, is highly relevant to his moral fitness to parent the triplets. Additionally, his citation in May 2008, for possession of drug paraphernalia was also relevant to his moral fitness.

*Id*. at 641-42.

In this case, the record contains Vernon's trial testimony that the children would be in his presence when they were at Christina's house. He also testified that he was charged with a crime and arrested following Bellard's accusations. His testimony indicates that after a federal civil suit was instituted by Bellard, he paid her $6,800 and the City of Lake Charles paid her $83,200 to sign an affidavit of non-prosecution. Vernon testified that as a result of the settlement, the suit was dismissed.

Chelsea's trial testimony indicates that Vernon made her feel uncomfortable at home. She testified that he would "randomly . . . come in [her] room and try to have a conversation with [her], but . . . he just stares[,] and it's . . . uncomfortable to [her]." She further testified that he would enter her room at night and stand by

her bed. She testified that he often observed her coming in and out of the bathroom.

In addition to both Vernon's and Chelsea's testimonies, the fact that he was arrested for forcing Bellard to perform oral sex on him while he was on duty as a police officer, a position of control and authority, is relevant to his moral fitness to parent the children. Additionally, any relevant evidence bearing on someone who might possibly be the children's future step-father should be considered in making a determination as to which custody arrangement would be in the children's best interest. *See Drewett v. Drewett*, 524 So.2d 893 (La.App. 3 Cir. 1988). Any evidence leading to the best interest of the children is admissible according to La.Code Evid. art. 1101(B)(2) where the Rules of Evidence are relaxed in matters of custody. The information contained therein is relevant, and both Christina and Vernon were properly questioned with respect to it.

Accordingly, the trial court did not err in this regard.

**IV.  Forbidden Contact With Children**

In her fourth assignment of error, Christina contends that the trial court improperly conditioned visitation by ordering that the minor children were not to have contact with Vernon, her then fiancé and now husband, and with whom she was residing. In support, she cites *Becnel v. Becnel*, 98-593, p. 5 (La.App. 5 Cir. 3/25/99), 732 So.2d 589, 592, *writ denied*, 99-1165 (La. 6/4/99), 744 So.2d 630, which provides:

> "A parent not granted custody or joint custody of a child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would not be in the best interest of the child." La. Civ.Code Art. 136(A). The law recognizes the non-custodial parent's entitlement to reasonable visitation unless it is shown it would seriously endanger the child's mental, moral or emotional health. *Maxwell v. LeBlanc*, 434 So.2d 375, 377 (La.1983). The

14

rights of any parent, however, are always subservient to the best interests of the child. *Maxwell v. LeBlanc*, 434 So.2d at 377.

We find that *Becnel*, 732 So.2d 589, is distinguishable from the facts in the instant case since in *Becnel*, there was no evidence showing that the step-mother was a threat to the children. In this case, the IA Report itself shows that Vernon's moral fitness could possibly be a threat to the children, especially Chelsea. Even if the IA Report was not admissible, there is trial testimony showing that Vernon's history casts doubt on his character and reputation. This includes Chelsea's testimony that she is uncomfortable around him and that she heard him curse at her younger brother. She also testified that Christina "puts Vernon before me and Konner."

Hunter's trial testimony corroborates Chelsea's testimony in that he also voiced concerns regarding Vernon to Christina. Hunter testified that his siblings do not like Vernon because "he screams, yells at them, cusses at them, [and] treats them horribl[y]." Hunter stated that Vernon is "disrespectful and hateful" to his siblings and that he disliked Vernon because he broke up his parents' marriage.

Vernon's testimony further indicates that he lied under oath regarding his reason for departure from the LCPD because he believed that his personnel records were sealed. The trial court, therefore, probably gave more weight to the children's testimony regarding incidents occurring in the home rather than Vernon's. Also, and as previously mentioned, the trial court stated that it was very concerned regarding Christina's denial about the things her children told her about Vernon.

15

Accordingly, the trial court did not abuse its discretion in conditioning Christina's visitation by prohibiting the minor children from having contact with Vernon.

## DECREE

The trial court's custody judgment is affirmed.  All costs of this appeal are assessed to Plaintiff/Appellant, Christina Marie Richard Sorrells.

**AFFIRMED**.